Filed 10/2/24

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| In re ROBERT EDWARD MAURY on Habeas Corpus. | C095050 |
| | (Super. Ct. No. 21CRHB5212) |

APPEAL from a judgment of the Superior Court of Shasta County, Daniel E. Flynn, Judge.  Affirmed.

Rene L. Valladares, Federal Public Defender, Ellesse Henderson, Assistant Federal Public Defender, for Petitioner Robert Edward Maury.

Rob Bonta, Attorney General, James William Bilderback II, Senior Assistant Attorney General, Kenneth N. Sokoler, Supervising Deputy Attorney General, Brian R. Means, Deputy Attorney General, for Respondent California Department of Corrections and Rehabilitation.

This capital case involves a series of murders and sexual assaults that occurred in Shasta County in the 1980s. In 1989, a jury found Robert Edward Maury guilty of various offenses, among which included three counts of first degree murder (Pen. Code, § 187)[1] and forcible rape (former § 261, subd. (2), now codified as § 261, subd. (a)(2)). After the penalty phase of the trial, the jury returned a death verdict, and the trial court imposed a death sentence. The California Supreme Court affirmed both the guilt and death judgments in 2003, and denied Maury's initial state habeas corpus petition in 2011. In 2021, after the superior court dismissed Maury's second state habeas corpus petition as procedurally barred, he filed a notice of appeal and a request for a certificate of appealability under section 1509.1, subdivision (c). We issued a certificate of appealability on one of 12 claims in Maury's petition: constructive deprivation of counsel under *McCoy v. Louisiana* (2018) 584 U.S. 414 (*McCoy*).

In *McCoy*, the United States Supreme Court held that a defendant has the right under the Sixth Amendment to insist that counsel refrain from admitting guilt, even when counsel determines that confessing guilt offers the best chance of avoiding the death penalty in a capital case. (*McCoy*, *supra*, 584 U.S. at p. 417.) In so holding, the high court explained: "With individual liberty—and, in capital cases, life—at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt." (*Id.* at pp. 417-418.) Thus, under *McCoy*, when a defendant expressly asserts and makes plain to counsel that the objective of his defense is to maintain innocence of the charged offenses and pursue an acquittal, counsel must abide by that objective and may not override it by conceding guilt. (*Id.* at pp. 423-424.) As recognized by *McCoy*, the Sixth Amendment right to

---

[1] Undesignated statutory references are to the Penal Code.

2

counsel includes a defendant's right to make their own choices about the proper way to protect their liberty, including the autonomy to decide that the fundamental objective of their defense is to assert innocence. (*Id*. at p. 422.)

In this appeal, Maury argues that under *McCoy*, counsel violated his Sixth Amendment right to determine the fundamental objectives of his defense--to maintain innocence--by presenting mitigating evidence at the penalty trial over his express objection, thereby rendering his death judgment invalid. According to Maury, counsel's presentation of certain mitigating evidence amounted to an admission of guilt in violation of the constitutional right recognized in *McCoy*. In a related argument, Maury claims that, in denying his motions to represent himself at the penalty phase pursuant to *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*), the trial court improperly forced him to proceed with counsel burdened by an irreconcilable conflict of interest, which adversely affected counsel's performance, constructively deprived him of the assistance of counsel, and prejudiced his case. As we explain, Maury is not entitled to habeas corpus relief. Therefore, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Maury is a notorious serial killer, sometimes referred to as the "Tipster Killer." As our Supreme Court explained in its 2003 opinion affirming Maury's convictions and death sentence, "[t]he prosecution presented a fact-intensive, circumstantial case of [Maury's] guilt, which interconnected three murders and the rape of a fourth victim." (*People v. Maury* (2003) 30 Cal.4th 342, 359 (*Maury*).) A central element in this case was the Shasta County Secret Witness program (Secret Witness), which was a telephone "hotline" that was established to receive information from citizens about crimes committed in the county. (*Id*. at pp. 359-360.) At the guilt phase, there was evidence showing that, after each of the murders, Maury called the hotline and provided information leading to the discovery of the victims' bodies, two of which were located in

3

the same general rural area in Redding where the rape occurred.[2] (See *id*. at pp. 360-362, 367-370, 396-398.) As explained by our high court, the evidence presented at trial--that included the Secret Witness calls, the similarities of the victims, and Maury's incriminating conduct and statements--amply supported a finding of guilt on the murder charges. Among other things, the evidence established a basis for the jury to reasonably infer that Maury made the Secret Witness calls and provided information only the killer or an eyewitness to the murders would have known about the victims, and that the reward money from the Secret Witness program motivated Maury, at least in part, to kill the women. (See *id*. at pp. 360-363, 367-374, 396-401.)

Because the facts giving rise to the criminal offenses for which Maury was found guilty are of limited relevance to the habeas claim at issue here, we summarize only the procedural background of this case. To the extent the underlying facts bear on our analysis, such as on the issue of prejudice, a detailed recitation of the circumstances surrounding the offenses is set forth in our Supreme Court's 2003 opinion affirming Maury's convictions and death sentence. (See *Maury*, *supra*, 30 Cal.4th at pp. 359-374.) We assume familiarity with that opinion.

In 1989, a jury found Maury guilty of the first degree murders of Averill Weeden, Belinda Jo Stark, and Dawn Berryhill (§ 187), an assault on Stark with intent to commit rape (§ 220), the robbery of Berryhill (§ 211), and the forcible rape of Jacqueline H. (former § 261, subd. (2)). (*Maury*, *supra*, 30 Cal.4th at p. 359.) The jury also found true the special circumstance allegations of multiple murder (§ 190.2, subd. (a)(3)) and

---

[2] The first murder victim was Maury's roommate. (*Maury*, *supra*, 30 Cal.4th at p. 360.) Her body was found in a wooded area located off a trail behind an automobile shop in Redding. (*Id*. at p. 361.) The bodies of the second and third murder victims were found in a different rural area in Redding, near the location where the rape of a fourth victim occurred. (*Id*. at pp. 360-361, 367-369.)

robbery murder (former § 190.2, subd. (a)(17)(i) now codified as § 190.2, subd. (a)(17)(A)). (*Maury*, at p. 359.)

As described more fully below, at the penalty phase, the prosecution sought a death verdict, relying on the evidence presented at the guilt phase and Maury's two prior felony convictions for receiving stolen property. (See *Maury*, *supra*, 30 Cal.4th at p. 376.) The defense presented mitigating evidence from three witnesses and argued for a sentence of life without the possibility of parole. The mitigating evidence related to Maury's mental condition, marijuana abuse, and family background, including the mental and physical abuse inflicted on him and his siblings by his alcoholic father. (See *ibid.*) Following the presentation of mitigating evidence, Maury insisted on taking the witness stand against the advice of counsel. Maury was not asked any questions by the defense or prosecution. Instead, he read a prepared statement to the jury. Among other things, Maury claimed that he had a "normal childhood," denied that he suffered from depression, and declared, "You found me guilty of three murders, one rape, one attempted rape and one robbery. It's totally unrealistic for you to give me life in prison without parole. If you think I'm guilty, you give me the death penalty." (*Ibid.*) The jury returned a death verdict, and the trial court imposed that sentence. (*Id.* at p. 359.)

In 2003, the California Supreme Court affirmed Maury's convictions and death sentence on automatic direct appeal. (*Maury*, *supra*, 30 Cal.4th at p. 359.) In 2004, the United States Supreme Court denied Maury's petition for a writ of certiorari. (*Maury v. California* (2004) 540 U.S. 1117.)

In 2004, Maury filed a state habeas corpus petition in the California Supreme Court, followed by an amended petition in 2007. In 2011, the petition was denied.

In 2012, Maury filed a federal habeas corpus petition in the United States District Court for the Eastern District of California. In 2020, after new counsel was appointed, the federal court granted Maury's request to stay proceedings and equitably toll the statute of limitations to permit counsel to investigate potential new claims. (*Maury v.*

5

*Davis* (E.D. Cal. Oct. 4, 2019, No. 2:12-cv-1043 WBS DB) 2019 U.S. Dist. Lexis 17359; *Maury v. Davis* (E.D. Cal. Mar. 31, 2020, No. 2:12-cv-1043 WBS DB) 2020 U.S. Dist. Lexis 57533.) Thereafter, the federal court granted two other similar requests. (*Maury v. Davis* (E.D. Cal. June 8, 2020, No. 2:12-cv-1043 WBS DB) 2020 U.S. Dist. Lexis 100909; *Maury v. Davis* (E.D. Cal. Aug. 27, 2020, No. 2:12-cv-1043 WBS DB) 2020 U.S. Dist. Lexis 156960.) In 2021, Maury filed a motion seeking permission to file a supplemental habeas corpus petition, arguing that he should be permitted to add claims prior counsel failed to raise due to conflicts of interest. (*Maury v. Warden, Calif. State Prison* (E.D. Cal. Sept. 26, 2022, No. 2:12-cv-1043 WBS DB) 2022 U.S. Dist. Lexis 174818.) In 2022, the magistrate judge assigned to the case issued an order recommending that Maury's motion be denied without prejudice, finding that amendment of the petition would be futile because Maury had failed to exhaust the proposed additional claims in state court. (*Ibid.*) To date, the federal court has not adopted or rejected the magistrate's findings/proposed order, and Maury's federal habeas corpus petition remains pending ruling in the district court.

In the meantime, the electorate approved Proposition 66, the Death Penalty Reform and Savings Act of 2016 (Gen. Elec. (Nov. 8, 2016) § 1) (Proposition 66), an initiative measure intended "to make the system of capital punishment 'more efficient, less expensive, and more responsive to the rights of victims.' " (*In re Friend* (2021) 11 Cal.5th 720, 723, 725 (*Friend*); see *Briggs v. Brown* (2017) 3 Cal.5th 808, 822 ["The measure's various provisions are intended to facilitate the enforcement of judgments and achieve cost savings in capital cases"].) Effective October 2017, Proposition 66 "made wide-ranging changes to the procedures for challenging convictions and sentences in capital cases. Among other things, Proposition 66 introduced new restrictions on the presentation of habeas corpus claims in what the measure refers to as 'successive' petitions: Individuals who file successive petitions must show they are actually innocent or ineligible for the death penalty before courts may consider the merits of their claims."

6

(*Friend*, at pp. 723-724; see §§ 1509, 1509.1.) As our Supreme Court recently explained: "The traditional rules governing the handling of successive petitions have long distinguished between the presentation of newly available claims and the presentation of claims that could have been raised earlier; the law has traditionally limited only the latter, forbidding consideration of repetitive or pretermitted claims except in a few, narrowly defined circumstances. Proposition 66 modified these rules by further narrowing the circumstances under which courts may consider repetitive or pretermitted claims in capital cases. But properly understood, Proposition 66's successiveness restrictions do not limit the consideration of claims that could not reasonably have been raised earlier, such as those based on newly available evidence or on recent changes in the law—claims that have not previously been thought subject to successiveness limitations. Thus, under the law as amended by Proposition 66, habeas corpus petitioners must make a showing of actual innocence or death ineligibility if they seek a second chance to make an argument they could have made earlier. No such requirement applies to the habeas corpus petitioner who raises a newly available claim at the first opportunity." (*Friend*, at p. 724.) If the sentencing court denies relief on a petitioner's successive petition for writ of habeas corpus, the petitioner may appeal that decision only if the sentencing court or the Court of Appeal grants a certificate of appealability. (See *id*. at p. 727; § 1509.1, subd. (c).)

In July 2021, Maury filed a second state habeas corpus petition in the Shasta County Superior Court (the instant petition), asserting 12 claims for relief. Of relevance here, Maury argued that his death sentence was invalid because he was "constructively deprived of counsel" at the penalty phase. Relying on *McCoy*, *supra*, 584 U.S. 414, Maury asserted that his Sixth Amendment right to control the objectives of his defense was violated when counsel presented mitigating evidence over his express objection. According to Maury, the trial court's error in allowing the presentation of such evidence was structural and required a new penalty trial without any need to show prejudice, since

7

the mitigating evidence was inconsistent with his clearly stated objectives of maintaining his innocence and protecting his family. Maury additionally argued that he was entitled to a new penalty trial because, in denying his motions to represent himself pursuant to *Faretta, supra*, 422 U.S. 806, the trial court committed structural error by forcing him to proceed with counsel "burdened by an irreconcilable conflict of interest, which adversely affected trial counsel's performance, constructively deprived [him] of the assistance of counsel, and prejudiced his case." In support of this argument, Maury asserted that, as a result of the irreconcilable conflict of interest, he "felt compelled to ask the jurors for death" and chose to do so "to counter the mitigation case presented by counsel over his objection."[3] Anticipating that the State would argue his claim was procedurally barred because it was asserted for the first time after the denial of his initial state habeas corpus petition, Maury argued "he [could] overcome any procedural bars" because he was relying on new law--*McCoy, supra,* 584 U.S. 414. Alternatively, Maury argued that, to the extent his prior appellate counsel should have but failed to raise the claim earlier, counsel was ineffective. Citing *In re Reno* (2012) 55 Cal.4th 428,[4] Maury added that his claim was not procedurally barred as successive because the "errors during the penalty phase led to a 'death penalty . . . imposed by a sentencing authority which had such a grossly misleading profile.' "

In September 2021, the Shasta County Superior Court dismissed the instant habeas corpus petition, without ordering a response from the State. The court found that Maury's claims were untimely and successive (in that the claims were previously raised and rejected or could have been raised previously but were not), and that Maury had failed to establish an exception to the general rule that such claims are procedurally

---

[3] Without elaboration, Maury alternatively argued he was entitled to a new penalty trial because trial counsel was ineffective.

[4] Superseded by statute on other grounds as stated in *Friend, supra*, 11 Cal.5th at p. 728.

barred. As for the ineffective assistance of prior counsel claim, the court found that it was "not factually supported" and therefore subject to dismissal.[5] The court did not reach the merits of Maury's claim that he was entitled to a new penalty trial under *McCoy, supra*, 548 U.S. 414. Nor did the court consider whether to grant a certificate of appealability on any of the claims asserted in the petition.

In October 2021, Maury filed a timely notice of appeal and a request for a certificate of appealability under section 1509.1, subdivision (c). In November 2021, we issued a certificate of appealability on one of 12 claims in Maury's petition: constructive deprivation of counsel under *McCoy, supra,* 584 U.S. 414. As for the remaining 11 claims, we found Maury had failed to make a substantial showing that they were not successive or that the requirements set forth in subdivision (d) of section 1509 had been satisfied; namely, Maury failed to show (by a preponderance of all available evidence whether or not admissible at trial) that he is actually innocent of any of the crimes in which he was convicted or is ineligible for the death penalty.

---

[5] A petitioner seeking to avoid the successiveness bar on grounds of ineffective assistance of prior counsel must " 'allege with specificity the facts underlying the claim that the inadequate presentation of an issue or omission of any issue reflects incompetence of counsel.' " (*Friend, supra*, 11 Cal.5th at p. 731, fn. 5 [noting that " 'mere omission of a claim "developed" by new counsel does not raise a presumption that prior habeas corpus counsel was incompetent, or warrant consideration of the merits of a successive petition' "].) Conclusory allegations are inadequate to satisfy a petitioner's pleading burden. (*In re Reno*, *supra*, 55 Cal.4th at p. 500.) In addition to requiring that habeas corpus petitions state "fully and with particularity the facts on which relief is sought," our Supreme Court has indicated that habeas petitions should also "include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations." (*People v. Duvall* (1995) 9 Cal.4th 464, 474.)

# DISCUSSION

## I

### *Habeas Corpus Law*

To put the series of reforms enacted by Proposition 66 into context, we briefly summarize the law as it existed prior to the approval of the measure and then describe the statutory reforms relevant to the habeas corpus claim at issue here.

A. *Traditional Habeas Corpus Principles*

"The California Constitution has protected the right to seek relief by habeas corpus since our state's founding. [Citations.] Habeas corpus . . . 'often represents a prisoner's last chance to obtain judicial review' of a criminal conviction. [Citation.] The law preserves this avenue to relief in service of principles of substantial justice: ' "Despite the substantive and procedural protections afforded those accused of committing crimes, the basic charters governing our society wisely hold open a final possibility for prisoners to prove their convictions were obtained unjustly." ' " (*Friend, supra*, 11 Cal.5th at p. 736.)

The right to seek habeas corpus relief, however, is not unlimited. Restrictions on the consideration of second or subsequent habeas corpus petitions (sometimes referred to as "successive" petitions) are well established. (See *Friend, supra*, 11 Cal.5th at pp. 727-728.) Our Supreme Court has "long limited piecemeal and repetitive claims" as an abuse of the habeas corpus remedy. (*Id*. at p. 736.)

Prior to the approval of Proposition 66, all capital inmates seeking to collaterally attack their death judgments were required to file their habeas corpus petition directly in the California Supreme Court. (*Friend, supra*, 11 Cal.5th at p. 726.) Whenever an inmate filed a second or subsequent state court habeas petition, the Supreme Court engaged in a two-step analysis to determine whether the procedural bar on successive claims applied. At the first step, the court determined whether the petitioner had adequately justified his failure to present a claim in an earlier petition. (*Id*. at p. 728.) In

10

the rare instance in which the petitioner provided adequate justification for his failure to raise the claim earlier (e.g., the claim depended on newly available evidence or a recent change in the law), the successiveness bar did not apply. (*Ibid*.) But if a petitioner did not adequately justify his failure to raise a claim earlier, the court proceeded to the second step of the analysis. (*Ibid*.) At that step, the court determined whether the petitioner had made a showing that the successive claim fell within the four-part fundamental miscarriage of justice exception set forth in *In re Clark* (1993) 5 Cal.4th 750.[6] (*Friend*, at p. 728.) If the petitioner failed to show the claim qualified for consideration under the fundamental miscarriage of justice exception, the claim was barred as successive. (*Ibid*.)

The traditional successiveness bar prevented a habeas corpus petitioner from "abusing the writ process by presenting claims in a repetitive or piecemeal manner." (*Friend, supra*, 11 Cal.5th at p. 730.) The purpose of the rule was to ensure that legitimate claims were raised early in the legal process, and it operated to preclude "consideration of claims that were unjustifiably omitted from earlier petitions" while providing " 'a "safety valve" for those rare or unusual claims that could not reasonably have been raised at an earlier time.' " (*Id.* at p. 728.) Thus, the rules governing state court habeas petitions "have . . . sought to 'permit the resolution of legitimate claims in the fairest and most efficacious manner possible,' without barring legitimate claims raised belatedly through no fault of the petitioner." (*Id*. at p. 737.)

---

[6] "In *In re Clark*, [the California Supreme Court] identified four situations in which the fundamental miscarriage exception is satisfied: (1) a highly prejudicial error of constitutional magnitude; (2) the petitioner's actual innocence; (3) presentation in a capital trial of a grossly misleading and highly prejudicial profile of the petitioner; or (4) conviction or sentencing under an invalid statute." (*Friend, supra*, 11 Cal.5th at p. 728.)

11

Although our Supreme Court, by its own admission, has not always been consistent in its use of the term "successive" in the context of habeas corpus petitions,[7] the substantive principle underlying the successiveness bar has remained constant: A claim has been barred as successive when it was omitted from an earlier petition without justification. By contrast, a claim that could not have reasonably been raised in an earlier petition was not subject to the bar on successive petitions. (*Friend, supra*, 11 Cal.5th at pp. 731-732.)

B. *Proposition 66*

In the November 2016 election, California voters approved Proposition 66. (Gen. Elec. (Nov. 8, 2016) § 1.) The initiative measure included "a series of findings and declarations to the effect that California's death penalty system is inefficient, wasteful, and subject to protracted delay, denying murder victims and their families justice and due process." (*Briggs v. Brown, supra*, 3 Cal.5th at p. 823.) The measure enacted a number of statutory reforms, including adding provisions that extensively "revamp" the procedures governing habeas corpus petitions in capital cases. (*Id*. at p. 824.) We tailor our discussion of the measure to the reforms at issue here. It is undisputed that the instant habeas corpus petition is a second or subsequent petition under habeas principles, as it was filed almost 10 years after the California Supreme Court denied Maury's initial state habeas corpus petition in 2011.

To advance the goals of Proposition 66, including making the system of capital punishment more efficient, the measure changed the procedures for handling and resolving habeas corpus petitions in capital cases, the bulk of which are found in newly

---

[7] In *Friend, supra*, 11 Cal.5th at page 732, the court acknowledged that it had "sometimes used the term 'successive' to refer to any second or subsequent petition, while referring to those petitions subject to the successiveness bar as *both* successive *and* unjustified."

added section 1509. (*Friend, supra*, 11 Cal.5th at p. 725.) Subdivision (a) of that provision requires that capital habeas corpus petitions generally be presented to the sentencing court (i.e., superior court) instead of the California Supreme Court. (§ 1509, subd. (a).) Subdivision (d) of section 1509 altered the standard for considering claims in a successive petition. In relevant part, it provides: "[A] successive petition whenever filed shall be dismissed unless the court finds, by the preponderance of all available evidence, whether or not admissible at trial, that the defendant is actually innocent of the crime of which he or she was convicted or is ineligible for the sentence. . . . 'Ineligible for the sentence of death' means that circumstances exist placing that sentence outside the range of the sentencer's discretion. Claims of ineligibility include a claim that none of the special circumstances in subdivision (a) of Section 190.2 is true, a claim that the defendant was under the age of 18 at the time of the crime, or a claim that the defendant has an intellectual disability, as defined in Section 1376. A claim relating to the sentencing decision under Section 190.3 is not a claim of actual innocence or ineligibility for the purpose of this section." (§ 1509, subd. (d).)[8]

---

[8] At the time of Maury's penalty trial (and now) section 190.3 provided: "If the defendant has been found guilty of murder in the first degree, and a special circumstance has been charged and found to be true, . . . the trier of fact shall determine whether the penalty shall be death or confinement in state prison for a term of life without the possibility of parole. In the proceedings on the question of penalty, evidence may be presented by both the people and the defendant as to any matter relevant to aggravation, mitigation, and sentence including, but not limited to, the nature and circumstances of the present offense, any prior felony conviction or convictions whether or not such conviction or convictions involved a crime of violence, the presence or absence of other criminal activity by the defendant which involved the use or attempted use of force or violence or which involved the express or implied threat to use force or violence, and the defendant's character, background, history, mental condition and physical condition."

Section 190.3 further provided that, in determining the appropriate penalty, the trier of fact must consider the relevant enumerated aggravating and mitigating circumstances— e.g., circumstances of the crime of which defendant was convicted and the existence of

13

Consistent with the traditional use of the term "successive" in habeas corpus law, Proposition 66's procedural bar on successive claims only applies when a petitioner filing a second or subsequent habeas corpus petition has not adequately justified his failure to present the claims in an earlier petition. (See *Friend, supra*, 11 Cal.5th at pp. 724, 729, 731-732, 741.) As previously indicated: "Proposition 66's successiveness restrictions do not limit the consideration of claims that could not reasonably have been raised earlier, such as those based on newly available evidence or on recent changes in the law—claims that have not previously been thought subject to successiveness limitations. Thus, under the law as amended by Proposition 66, habeas corpus petitioners must make a showing of actual innocence or death ineligibility if they seek a second chance to make an argument they could have made earlier. No such requirement applies to the habeas corpus petitioner who raises a newly available claim at the first opportunity." (*Id*. at p. 724.) Our Supreme Court has explained that the successiveness standards in Proposition 66 preserved the two-step inquiry employed in traditional habeas corpus practice, but at the second step it replaced *Clark's* four-part fundamental miscarriage of justice exception with a narrower exception (i.e., a "more stringent standard") restricted to claims of actual innocence or death penalty ineligibility. (See *Friend*, at pp. 729, 739-740.)

Under Proposition 66, to pursue an appeal from the denial of relief on a successive habeas corpus petition collaterally attacking a judgment of death, the petitioner must obtain a certificate of appealability from the superior court or the Court of Appeal, which may be issued only if the petitioner has shown "both a substantial claim for relief . . . and

---

any special circumstances found to be true, the presence or absence of any prior felony conviction, whether or not the offense was committed while the defendant was acting under the influence of extreme mental or emotional disturbance. A sentence of death must be imposed if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances. (*Ibid*.) However, if the trier of fact determines that the mitigating circumstances outweigh the aggravating circumstances, a sentence of life without the possibility of parole must be imposed. (*Ibid*.)

a substantial claim that the [actual innocence or ineligibility for the death sentence] requirements of subdivision (d) of Section 1509 have been met." (§ 1509.1, subd. (c).) The issuance of a certificate of appealability is also permitted upon "a substantial showing that the claim, although presented in a subsequent petition, was not successive within the meaning of *Clark's* rule." (*Friend*, *supra*, 11 Cal.5th at p. 747.) Under *Clark*, a claim is ordinarily not successive when the petitioner offers adequate justification for his failure to present it in an earlier petition. (*Id*. at p. 731.) Thus, a finding of successiveness may be avoided by a showing that " 'the factual basis for a claim was unknown to the petitioner and he had no reason to believe that the claim might be made' and the claim is 'asserted as promptly as reasonably possible.' " (*Ibid*.) Claims based on changes in the law that are retroactively applicable to final judgments and claims premised on ineffective assistance of prior counsel may also justify presentation in a subsequent petition. (*Ibid*.)

## II

### *McCoy Error*

Maury's primary contention is that he is entitled to a new penalty trial under *McCoy*, *supra*, 584 U.S. 414, which he claims applies retroactively to final judgments of conviction. In connection with these arguments, Maury claims the superior court erred in determining that his *McCoy* claim was procedurally barred as untimely and successive. As we will explain, because we conclude Maury's claim fails on the merits, we need not and do not decide whether *McCoy* applies retroactively to final judgments or whether the superior court erred in finding the claim procedurally barred.[9]

---

[9] At oral argument, Maury's counsel's requested remand to the trial court for "fact-finding" if we were inclined to reach the merits of the underlying claim. Because any facts in dispute are not relevant to our disposition of this appeal, we decline to remand. Simply put, regarding the presence or absence of *McCoy* error, the record is complete.

A. *Additional Background*

On August 24, 1989, the jury rendered its guilt phase verdicts and special circumstance findings. Later that same day, the trial court tentatively scheduled the penalty trial to commence on August 30. The next day, after an in camera hearing (discussed below), the penalty trial was continued to August 31. The penalty trial began on August 31 and the jury returned a death verdict on September 8.

Next, we summarize the relevant portions of the penalty phase.

1. *In Camera Hearings*

a. *August 25 Hearing*

The day after the conclusion of the guilt phase, the defense requested an in camera hearing concerning scheduling and the evidence it intended on presenting at the penalty trial. At that hearing, the defense indicated that it had two problems, only one of which is relevant here--Maury's preferred penalty. When asked, defense counsel explained: "[Maury] has previously indicated . . . that, if convicted, . . . he wants to take the witness stand and ask for the death penalty. My personal opinion is that I think that's highly inappropriate and I don't think it's in his best interests to do that, if for no other reason on appeal, and . . . I want the opportunity to talk with him and to convince him that that's not an appropriate way to end this trial. I understand the law and I understand he . . . has that right to get up and do that. And I also understand my ethical obligation to go ahead and present factors in mitigation and argue against that."

Following these remarks, there was no further discussion about Maury's preferred penalty. Instead, there was a discussion about whether a psychologist, who the defense had hired to do a "dynamics and background study" on Maury, would testify at the penalty trial.

16

b. *August 29 Hearing*

Two days before the commencement of the penalty trial, Maury and his attorneys met with the trial court in camera outside the presence of the prosecutors and the jury. During that meeting, the following exchange occurred:

"THE COURT: The record will indicate that the prosecutors have left and that the only remaining parties are the defendant, his attorneys and the court personnel. Gentlemen?

"[DEFENSE COUNSEL]: Your Honor, what my client is indicating is that he prefers the death penalty of the two penalties that are available to the jury at this time and is attempting to get that accomplished. He has instructed us to get that . . . penalty[] accomplished in one way or another. At the same time, I believe that he is confident or at least is steadfast in the fact that he does not wish to take the witness stand in the penalty phase. . . . [H]ave I correctly stated what's going on?

"THE DEFENDANT: Yes, 95 percent. I mean if I had to take the stand, if I thought the only way I was going to get the death penalty . . . was . . . to take the stand and piss the jury off, I'd do that. I understand my lawyers have a legal obligation, a moral obligation. They have to put on some type of a case, but if there's anyway [*sic*] that I could handcuff them . . . to get them to not put on the case, I would do that. I'm not . . . trying to commit suicide or anything. I've got a couple, three, four good reasons why I think the death penalty would be more appropriate. I'm honestly not trying to make a martyr out of myself, not trying to commit suicide. I have . . . what I think are good reasons.

"THE COURT: All right. But you do understand that their obligation is to -- and I assume that the reason the law is that way is, as logical as you feel your approach may be, the law probably feels that two people who are not personally subjected to that type of a penalty can more objectively look at how you may feel down the road and they have an

obligation to present any mitigating circumstances or evidence that they can find that's in your favor. [¶] I take it that you don't argue with their obligation or right to do that?

"THE DEFENDANT: No. If I could argue it, I would. I think they agree with some of my reasoning and they feel that they're in a corner where they have to put on a good defense, and at the same time I'm trying to get them not to put on a good defense. I believe we all agree that I do have some very good reasons and if there was any way I could talk you into releasing them from their obligation, I would do that. I'm stuck.

[DEFENSE COUNSEL]: I would concur with [Maury]. I think his views are well formulated. This isn't the first time we've discussed them, and he can provide recognizable reasons for his opinion and I agree with them.

"THE COURT: Well, the fact that you may be in agreement is not going to hinder your ability to do your best to present mitigating factors; is it?

"[DEFENSE COUNSEL]: No. I'll do my best, Judge. It may be difficult under these circumstances and that's why we wanted to have this little discussion on the record so that everybody is clear as to what -- [¶] . . . [¶] [o]ur obligations are and what we're going to be trying to do.

"THE COURT: Well, does either attorney doubt his ability to fulfill his responsibilities to present what favorable and mitigating evidence there may be available to the defense?

[DEFENSE COUNSEL]: I don't have any problem with submitting the evidence, your Honor. That's not the problem. It's the argument that comes afterwards that is difficult to come up with. Now, we can be critical of the jury in their decision thus far and that will be easy. But as far as the rest of it, the rest of that argument, it will be quite difficult. Obviously, having . . . nine chances to come up with other findings, the jury has rendered their verdict and -- [¶] . . . [¶] [w]e have no illusions as to what the penalty is going to be.

"THE COURT:  I assume you'll be able, as professionals, to argue the normal bases for sympathy in a  proper and adequate fashion?

"[DEFENSE COUNSEL]:  I hope so.

"THE DEFENDANT:  That, to me, is not a problem because they . . . both want to put on a good defense and make sure.  They're more than capable of putting on a good defense, but I think I'm handcuffing them.  And to be quite frank, I'm trying my best to sabotage whatever case they make.  So if something doesn't turn out the way they want, it's not their fault, it's my fault.

"[DEFENSE COUNSEL]: My client has indicated a desire to waive jury in the pursuit of this and he's also proposed a certain stipulation that perhaps the Court would not even entertain.  One that he's asking me to tender to the District Attorney is to stipulate to the death penalty in exchange for the return of his property which was seized by the authorities.  Now, I've not even proposed that to the District Attorney as yet, but Mr.  Maury is trying his best to get his wishes accommodated.

"THE DEFENDANT:  And, believe me, this is not making the other attorney over here very happy at all.

"THE COURT:  Well, these things are certainly never easy and always difficult. [¶]  All right, gentlemen. Anything else that you want on the record?

"[DEFENSE COUNSEL]:  Would the Court entertain waiving jury, if the parties stipulate?"

After the trial court questioned the validity of such a stipulation, the following exchange occurred:

"[DEFENSE COUNSEL]:  One of the problems that has come up, and it's in regard to what Mr. Maury indicated as his attempts to sabotage our efforts. . . .  [A]s part of the sympathy and attempt to humanize Robert Maury, we intended to call his sister, Carol Cummins.  She has at all times been cooperative and is not under subpena [*sic*] and, in fact, we have appointments set up to talk with her tomorrow afternoon.  [¶]

19

[Maury] informed me this morning that he has gotten word to [Cummins] that he does not want her testifying and would she please go to Sacramento for the next three days, and that may cause a problem with being able to proceed on Thursday. [U]nder my ethical obligation, I have to present someone from the family. The mother is the most potentially appropriate, and [Maury] has expressed a desire in no way does he want his mother on the stand crying for his life. And I think he has a right to decide at least that limited issue. But we need to put the sister on and if, in fact, the sister is gone to Sacramento to avoid subpena [*sic*], then I'm going to be asking for a continuance until we can locate her and get her into court.

"THE COURT: And do you have someone out trying to serve process on her now?

"[DEFENSE COUNSEL]: Yes.

"THE COURT: Well, your decision, unfortunately, in this type of a situation regarding putting on the mother should relate to the merits of the defense and the merits of the available evidence and not to the defendant's wishes.

"[DEFENSE COUNSEL]: I understand that, your Honor. Actually, the best evidence is the sister and not the mother. You know, from a sympathy appeal, the mother may have a lot more sympathy, but from a factual, intellectual standpoint as to explaining the background of the family, the sister is actually the best witness of that. I've spoken to both of them, and the sister, in my professional opinion, is by far the better witness. Will make the better witness.

"THE COURT: All right.

"THE DEFENDANT: If that was to come about, I would insist on taking the witness stand. And I'm quite confident that I could deny anything, that you could bring 400 people in here and I'm quite confident I make a better impression on that jury than 400 people.

20

"THE COURT: As you know, that's your choice. You have a right to take whatever position you want.

"THE DEFENDANT: They got enough family problems right now. Put my sister on or mother on, it's going to cause more problems that I'd just as soon as not come up.

"[DEFENSE COUNSEL]: His concern -- and I think it's a valid one -- is there has been problems with the father in this family. And, right now, the father is taking care of the daughter and, you know, kind of watching over her. And things have improved, I think a lot better than they were when they were all children. [¶] And one of the things that I possibly may be going to request is that when the family members testify, that we exclude the parents. And what they're concerned about is that it's going to be reported in the newspaper and it's going to get back to the father and all these old wounds are going to open back up and it going to cause even more problems in the family. That's [Maury's] concern.

"THE COURT: That's accurate?

"[DEFENSE COUNSEL]: And I think it's a valid concern.

"THE DEFENDANT: That's accurate.

"[DEFENSE COUNSEL]: And the solution to that, in my opinion, is simply close the court. Exclude the media, exclude the public and let the daughter testify and seal the record. That way the jury hears it, the jury can consider it for whatever value. Yet we're still protecting the confidentiality and integrity of the family.

"THE DEFENDANT: I can live with that.

"THE COURT: Well, of course, that brings up a whole new set of rules. There's a third entity we have to deal with and their rights also. Anyway you can let me know the progress of that when you can. [¶] All right. Anything else you want to discuss?

"[DEFENSE COUNSEL]: (Shakes head).

"THE COURT: And you're clear that despite this potential conflict between the [Maury's] desires and your obligations that when you make decisions concerning

21

presentation of evidence that your primary duty is your obligation to present mitigating evidence?

"[DEFENSE COUNSEL]: Yes, that's absolutely clear.

"THE DEFENDANT: That's where the problem comes in . . . because they insist . . . they have to do that, but . . . I'm not trying to say I'm paying their bills, but I feel like they're working for me and so I should have some say with my case. If I went out and hired [defense counsel] for $200 an hour, whatever he charges, and he got to court, I would think he would be following my instructions.

"THE COURT: Normally, as you know, in 99.9 percent of the situations in these cases, that is the case. In this one very limited area, he has dual responsibilities.

"THE DEFENDANT: I appreciate that.

"THE COURT: All right, gentlemen. Anything further you need to discuss?

"[DEFENSE COUNSEL]: No, sir."

### c. *August 31 Hearing*

Two days later, another in camera hearing was held after Maury indicated that he wanted to "take over [his] defense." In making this request, Maury clarified that he did not want to discharge his attorneys, explaining that he wanted counsel present during the penalty trial to "protect" any rights he might not know about.

During the ensuing in camera hearing, which occurred immediately before the commencement of the penalty trial, Maury stated: "Well, I have some real problems -- my attorneys are both doing an outstanding job, and that's one reason I want to take over my defense is because they are doing such a good job. I think I would handle the penalty phase in a different way, and I feel if I was able to defend myself, I would have more control over the final phase. I mean, there are some witnesses that my lawyers want to call that I can't stop them from calling but I wouldn't call."

Upon questioning, Maury indicated that he understood his attorneys were "legally bound" to present mitigating evidence, but reiterated that the reason he wanted to "take

22

over" his defense was because his attorneys were "doing a good job." Maury explained that he would "have to get on the stand" and personally address the jury if the proposed defense witnesses testified. Later, Maury acknowledged that he had the right to testify at the penalty trial, and that the proposed defense witnesses "might shed some sympathy on [him]." Maury, however, explained that he did not want the witnesses to testify because their testimony "would cause [his] family problems." Specifically, Maury was concerned that his father would stop "helping" his sister (Cummins), a single mother with three children, if she testified about their upbringing, including his father's physical and sexual abuse. Maury was also concerned about Cummins' wellbeing; he did not want her to relive their difficult childhood on the witness stand. As for the psychiatrist his attorneys intended to call, Maury said that he would not call that witness if he were representing himself.

After hearing argument, the trial court denied Maury's *Faretta* motion over defense counsel's objection. Relying on *People v. Burton* (1989) 48 Cal.3d 843, the court found the motion untimely, citing various factors, including that defense counsel had done a "good job" and that granting the motion at that juncture ("the very end of a five-month trial") would disrupt the proceedings. (See *id*. at p. 853 [identifying factors trial courts consider in determining whether to grant a *Faretta* motion after trial has commenced].) In so ruling, the court advised Maury that he had the right to tell the jury the penalty he preferred, regardless of whether he was represented by counsel.

Following this hearing, the trial court advised the prosecution outside the presence of the jury that it had granted Maury's request to exclude his father from the courtroom during the penalty trial, and denied Maury's *Faretta* motion.[10] The court noted that

---

[10] Maury renewed his *Faretta* motion during the penalty trial after two mitigation witnesses testified. At an in camera hearing, the trial court denied the motion for the reasons it had previously stated. In so ruling, the court advised Maury that his attorneys

cameras would not be allowed in courtroom while Cummins was testifying, and that it had "asked the press to use sensitivity and restraint in reporting the details of that testimony."

Thereafter, defense counsel explained that the defense intended on calling Susan Szerencsy as a witness. When asked, counsel explained that Szerencsy, a "counselor" employed by a social services organization, would testify that, in the summer of 1987,[11] Maury requested medication for his brother, who (according to Maury) talked about murder all the time and had "some serious mental conditions, delusions, hallucinations, [and] various kinds of things like that." According to counsel, Szerencsy believed that Maury could have been referring to himself rather than his brother during this conversation, and that Maury's remarks would be offered as "a cry for help." That is, for the purpose of showing that Maury recognized he had a problem and wanted to do something about it, not to "point[] the finger at [the] brother for responsibility for [the charged] crimes." Counsel noted that Szerencsy did not know whether Maury was actually talking about himself, and that, in any event, counsel was not interested in eliciting an opinion from Szerencsy on that point. Shortly thereafter, counsel made it

---

were "obligated to work to save [his] life," but noted that Maury had the right to "tell the jury what [he felt] should be done," (i.e., his preferred penalty), which the court characterized as a more "just way to proceed." When defense counsel indicated that he did not feel like he was representing Maury's best interests by not seeking a death verdict in accordance with Maury's wishes, the court explained that counsel was legally required to present the available mitigating evidence for the jury's consideration in deciding the appropriate penalty. As part of that discussion, the trial court advised Maury that, even if defense counsel refused to call him as a witness, he had the right to take the witness stand against the advice of counsel and make any statement he wanted. For his part, Maury did not dispute counsel's representation that the only reason he wanted to testify was to ensure the jury returned a death verdict. Nor did Maury dispute that his counsel had repeatedly advised him against testifying at the penalty trial.

[11] Weeden disappeared in 1985 and Berryhill and Stark disappeared at the end of June 1987. (*Maury*, *supra*, 30 Cal.4th at p. 360.)

clear that Maury did not want Szerencsy to testify, explaining: "[Maury] feels that by putting on this evidence that I'm in effect insinuating that he may be guilty of these crimes, he is vehemently opposed to that, objects to my doing that, and the only reason I'm doing that is because I feel I have an ethical obligation to put on evidence that may be sympathetic to the jury and I think that . . . if this evidence is characterized as a cry for help that it may be sympathetic." In response, the trial court stated that it would "allow the evidence."

### 2. *Opening Statements and the Penalty Trial Evidence*

The defense did not make an opening statement at the outset of the penalty trial. The prosecution, for its part, simply stated that the evidence presented at the guilt phase was sufficient to justify a death verdict. Thereafter, the parties stipulated to the admission of evidence showing that Maury had two prior felony convictions for receiving stolen property.

The prosecution did not call any witnesses and the defense called three witnesses: Szerencsy, Cummins, and Fred Rosenthal, M.D., Ph.D. (education and psychology). After these witnesses testified, Maury (as promised) insisted on taking the witness stand. As recounted more fully below, neither the prosecution nor the defense asked Maury any questions. Instead, Maury read a prepared statement to the jury. No other evidence was presented at the penalty trial.

Next, we summarize the pertinent portions of the penalty trial testimony.

### a. *Szerencsy*

On direct examination, Szerencsy testified that she was a marriage and family psychotherapist employed by Northern Valley Catholic Social Services, that she knew Maury because he worked for her parents at a miniature golf course in the summer of 1987, and that, according to her father, Maury was very dependable, well-liked, and friendly. Szerencsy described her relationship with Maury as "[v]ery casual;" they spoke to each other every "once in a while." In one of those conversations, Maury mentioned

25

that his brother was "giving this girl the creeps because he would sit in the living room with the lights out and he would rock in a chair and he would talk about killing people." When Szerencsy told Maury that his brother "should seek help" (i.e., mental health treatment) as soon as possible, Maury indicated that his brother had been treated or was in treatment and was taking several antipsychotic medications. Thereafter, Maury asked Szerencsy if she could provide him with antipsychotic medications. Szerencsy responded in the negative, explaining that she could not prescribe medication because she was not a psychiatrist. The following exchange then occurred between Szerencsy and defense counsel:

"Q     Okay. In your field of counseling do you ever encounter situations where a client will come to you under the guise that he's asking . . . [for] information to help a relative or friend?

"A     It's not unusual.

"Q     Well, what happens?

"A     I don't think it's uncommon for . . . a client [to] come in and discuss a particular event or difficulty they're having in their life and pretend that it's somebody else.

"Q     In this particular conversation that you had with [Maury] do you have any opinion as to whether or not he was using that guise to get information?

"A     I didn't at the time, so --

"Q     Do you now?

"A     -- so I wouldn't make that supposition. It's possible."

On cross-examination, Szerencsy recalled an uncomfortable conversation she had with Maury. During that conversation, Maury asked Szerencsy whether he was the type of guy she would ever "go out with." When Szerencsy indicated that she had a boyfriend, she "got the feeling that there was some agitation or some tension." Upon further questioning about this conversation, Szerencsy noted that Maury was wrapping a

26

"[s]tring or something" around his finger and pulling it.[12]  Later, Szerencsy indicated that her father had nicknames for Maury, including "Bobby" and "Manson."[13]

On redirect examination, Szerencsy clarified that her father's "reference to Manson" was based on Maury's physical appearance (i.e., long hair and beard), not Maury's conduct, attitude, or behavior.

b. *Cummins*

Before Cummins took the witness stand, the trial court granted Maury's request to be absent from the courtroom during her testimony.  Thereafter, Cummins told the jury that she was Maury's older sister, that she was around a year or so older than him, and that they had two brothers, one of whom had been diagnosed as a paranoid schizophrenic. When asked about her father, Cummins explained that he "started drinking really heavy" on a daily basis when she was in the fourth grade (i.e., around nine years old), that he was "always mean and vulgar and drunk all the time," that he had "so much meanness and hate inside him," and that she did not have "any good memories from fourth grade on." Cummins added that her father was verbally abusive to her brothers, and would scream in the house and spank them with a belt or switch at least two to three times per week. Cummins also recalled instances where her father broke items in the house while intoxicated, and noted that there were occasions when he tried to molest her by putting his hands down her pants.  Upon questioning, Cummins explained that she and her

---

**12**  At the guilt phase, there was evidence that Weeden had been strangled with a nylon clothesline, Berryhill had been strangled with a scarf, and Stark had been strangled with a boot string.  (*Maury, supra*, 30 Cal.4th at pp. 361-362, 369-370, 372, 374, 398-401.) There was also evidence that, prior to raping Jacqueline H., Maury placed a rope around her neck and demanded she remove her clothes as he tightened the slip knot on the rope. (*Id*. at pp. 364, 403.)

**13**  The "Manson" nickname was apparently a reference to Charles Manson, one of the most infamous criminals in American history.  Manson was a cult leader whose followers carried out a series of murders in the late 1960s.

siblings "didn't care for [their father] very much," thought he was crazy, and were "really afraid of him." According to Cummins, nothing she or her siblings ever did was good enough for their father, and that he never taught his children how to do anything.

As for her relationship with Maury, Cummins explained that he was "always real nice" to her, and "always protective of [her]" from when she was in fourth grade until she started high school. When asked, Cummins said that Maury "routinely smoked marijuana" while he was in high school, but noted that he never "really" got into any trouble at school and was never "violent towards classmates."

### c. *Dr. Rosenthal*

Dr. Rosenthal, a physician who specialized in the field of psychiatry, testified that he conducted a psychiatric assessment of Maury in 1988. As part of that assessment, Dr. Rosenthal concluded that Maury had "several areas of difficulty," including mild symptoms of depression, a very long history of heavy marijuana use, and emotional problems from being raised by a verbally abusive and occasionally violent alcoholic father. In reaching these conclusions, Dr. Rosenthal characterized Maury's childhood as "fairly difficult," destructive, and "somewhat chaotic," explaining that persons raised in such a situation (like Maury) do not do well in school, cannot hold a job, are not productive, and very often resort to drugs to "handle the feelings that they can't otherwise cope with."

Upon questioning, Dr. Rosenthal opined that Maury was not suffering from any antipsychotic symptoms, and that there was no evidence Maury had multiple personality disorder, although Dr. Rosenthal believed Maury suffered from a non-severe type of borderline personality disorder. Dr. Rosenthal emphasized that Maury did not have any history of serious violence or anger (including severe anger against women), which he explained would be expected if Maury had committed the charged offenses. According to Dr. Rosenthal, Maury did not have the personality type "that would lead [one] to

28

predict that he would be able to behave in the way that he would have to behave in order to commit [the] kinds of crimes" he was found guilty of committing.

On cross-examination, Dr. Rosenthal conceded that he could not "predict categorically" whether or not a person was likely to be violent. However, he explained that Maury did not have a history of violence or "serious psychopathology," which are "predictors" that are "very valuable if you're trying to make that kind of decision."

### d. *Maury*

When Maury took the witness stand following the presentation of mitigating evidence, defense counsel indicated that he did not have any questions for him. Maury then read the following statement to the jury:

"Because of your verdict and findings I feel the only penalty that you can conscientiously . . . consider is the death penalty. You found me guilty of three murders, one rape, one attempted rape and one robbery. It's totally unrealistic for you to give me life in prison without parole. If you think I'm guilty, you give me the death penalty.

"I've got a lot of things written here, but I'll quit right there.

"And I had a normal childhood. This stuff that they said, my family said, I'm not going to say my family lied, but I'll say they shaded the truth a little bit to help me. I had a normal childhood.

"And drugs, the psychiatrist said I was depressed. I got them medications to help [me] sleep, not because I was depressed. I don't think I've ever been depressed in my life. I've always been able to laugh. I don't believe I've ever been depressed. So I got that drug not for depression but to help me sleep.

"I'll quit there."

After the prosecution indicated that it had no questions for Maury, he made an additional statement:

"Again, if you consider life without parole that leads me to believe there's some still some doubt in your mind about my guilt. And, again, I say if you think I'm guilty

29

then you give me life because that's the only penalty that's fair. Charles Riel last year was convicted of one murder, one robbery; he got the death penalty. The death penalty for one person. You say I'm guilty of three; you can't give me life in prison, that's unrealistic. I can't see it.

"I would like to say something about my lawyers. They've done a real good job and on their closing arguments they're going to get up, do a real good job. That's their job. They have to do that. I'm not telling you not to listen to them, but that's their job. They have to do it."

### 3. *Closing Argument*

In closing argument, the prosecution asked the jury to return a death verdict, relying on (as aggravating circumstances) the evidence presented at the guilt phase (i.e., the circumstances of the crimes and the existence of special circumstances), Maury's criminal history (two prior felony convictions for receiving stolen property), and the lack of "anything in mitigation." While the prosecution acknowledged that Maury had a difficult upbringing, it argued that Maury's childhood did not mitigate or excuse the premeditated murders. As for other potentially mitigating circumstances, the prosecution asserted that there was no evidence Maury "was acting under any kind of mental or emotional disturbance" to justify a sentence other than death. The prosecution also questioned the value of Szerencsy's testimony, explaining: "[Szerencsy] said that [Maury] came and talked to her once about a brother of his who had some serious mental problems and there was some suggestion in the questioning that maybe [Maury] was talking about himself. Well, maybe you could draw that conclusion reasonably if there were no brother . . . that had these serious mental problems. We know that brother existed and that he had those problems and, obviously, [Maury] was talking about him."

In response, the defense argued that the appropriate penalty was life without the possibility of parole. In support of its position, the defense claimed that the testimony of Cummins and Dr. Rosenthal showed that Maury was not the "kind of person" who could

30

have committed the charged offenses, noting that there was no evidence showing Maury had a history of violence. In other words, the defense took the position that Maury was factually innocent. While the defense conceded there were two circumstances in aggravation--the circumstances of the crimes of which Maury was convicted and his two prior convictions--counsel argued that these factors did not warrant a death sentence. As for circumstances in mitigation, the defense cited Maury's "dysfunctional alcoholic family," the absence of any prior violent acts by Maury, his drug use, depression, and cooperation with law enforcement (including not fleeing to avoid arrest), and Szerencsy's testimony suggesting that he was "seeking help" by "talking to her about medication" a "sick brother" and murder. The defense made no further comment on Szerencsy's testimony.

### 4. *Jury Instructions*

Prior to penalty phase deliberations, the jury was instructed pursuant to various pattern instructions, among which included CALJIC No. 8.84 (Penalty Trial-Introductory), CALJIC No. 8.85 (Penalty Trial-Factors for Consideration), and CALJIC No. 8.88 (Penalty Trial-Concluding Instruction). Among other things, the jurors were told that the penalty for Maury was either death or life without the possibility of parole, and that in determining the appropriate penalty, they were required to consider the evidence received at both the guilt and penalty phases of trial as well as certain aggravating and mitigating circumstances--e.g., the circumstances of the crime of which defendant was convicted and the existence of any special circumstance found to be true, the presence of any prior felony conviction, whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance, any circumstance which extenuates the gravity of the crime, and any sympathetic or other aspect of the defendant's character offered as a basis for a sentence less than death. The jurors were also told that they could consider any lingering or residual doubts as to Maury's guilt as a basis for determining that life without the possibility of parole was the

31

appropriate penalty.  To justify a death verdict, the jurors were instructed that they "must be persuaded that the aggravating circumstances [were] so substantial in comparison with the mitigating circumstances that it warrant[ed] death instead of life without parole."

B.  *Applicable Legal Principles*

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel.  [Citations.]  The ultimate purpose of this right is to protect the defendant's fundamental right to a trial that is both fair in its conduct and reliable in its result."  (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.)

The right to the assistance of counsel entitles a criminal defendant to " 'the reasonably competent assistance of an attorney acting as his diligent conscientious advocate.' "  (*People v. Ledesma, supra,* 43 Cal.3d at p. 215.)  A defendant who elects to be represented, however, does not "surrender control entirely to counsel."  (*McCoy, supra*, 584 U.S. at p. 421; see also *Faretta, supra*, 422 U.S. at p. 820 [the Sixth Amendment "speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant"].)  Rather, the Sixth Amendment "contemplat[es] a norm in which the accused, and not a lawyer, is master of his own defense."  (*Gannett Co. v. DePasquale* (1979) 443 U.S. 368, 382, fn. 10.)

In criminal cases, counsel and client have different purviews.  Trial management, including strategy and tactics, is the lawyer's province:  "Counsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.' "  (*McCoy, supra*, 584 U.S. at p. 422; see *Gonzalez v. United States* (2008) 553 U.S. 242, 249 [counsel properly has the prerogative to control "choices affecting conduct of the trial, including the objections to make, the witnesses to call, and the arguments to advance"]; *Faretta*, *supra*, 422 U.S. at 820 [explaining that when one "chooses to have a lawyer manage and present his case," he cedes "the power to make

32

binding decisions of trial strategy in many areas"].)  In contrast, "[s]ome decisions . . . are reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal."  (*McCoy*, at p. 422.)

Autonomy to decide that the objective of the defense is to maintain innocence of the charged offenses falls within the category of decisions reserved for the defendant. (*McCoy, supra*, 584 U.S. at p. 422.)  As explained by the *McCoy* court: "Just as a defendant may steadfastly refuse to plead guilty in the face of overwhelming evidence against h[im], or reject the assistance of legal counsel despite the defendant's own inexperience and lack of professional qualifications, so may []he insist on maintaining h[is] innocence at the guilt phase of a capital trial.  These are not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*."  (*Ibid.*; see *Weaver v. Massachusetts* (2017) 582 U.S. 286, 295 [self-representation will often increase the likelihood of an unfavorable outcome but "is based on the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty"]; *Martinez v. Court of Appeal* (2000) 528 U.S. 152, 165 (Scalia, J., concurring in judgment) ["Our system of laws generally presumes that the criminal defendant, after being fully informed, knows his own best interests and does not need them dictated by the State"].)

*McCoy* held that a capital defendant has the Sixth Amendment right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty.  (*McCoy, supra*, 584 U.S. at pp. 417.)  In so holding, the court explained:  "With individual liberty—and, in capital cases, life—at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense:  to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt."  (*Id.* at pp. 417-418.)

33

In *McCoy*, the defendant (McCoy) was charged with three counts of first degree murder after three of his estranged family members were shot and killed. Defense counsel concluded that the evidence against McCoy was overwhelming and that the only way to avoid the death penalty would be to concede guilt and urge mercy at the penalty phase in view of McCoy's " 'serious mental and emotional issues.' " (*McCoy, supra*, 584 U.S. at p. 420.) McCoy, however, "vociferously insisted" that he did not commit the killings, clearly instructed his counsel to pursue acquittal instead of any concession of guilt, and testified he was innocent. (*Id*. at p. 417.) Counsel nonetheless conceded that McCoy was guilty of murdering the victims at both the guilt and penalty phases of trial, and the jury returned three death verdicts. (*Id*. at pp. 417-420.) In concluding that a new trial was warranted because counsel's actions violated McCoy's protected Sixth Amendment "autonomy right" (*id*. at p. 426), the court explained: "Counsel may reasonably assess a concession of guilt as best suited to avoiding the death penalty . . . . But the client may not share that objective. He may wish to avoid, above all else, the opprobrium that comes with admitting he killed family members. Or he may hold life in prison not worth living and prefer to risk death for any hope, however small, of exoneration. [Citations.] When a client expressly asserts that the objective of '*his* defence' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." (*Id*. at 422-423.)[14] The court further held: "Violation of a defendant's Sixth Amendment-secured autonomy ranks as

---

[14] Cases finding *McCoy* error have involved counsel conceding guilt over the defendant's unambiguous objection. (See, e.g., *McCoy, supra*, 584 U.S. at pp. 420-421; *People v. Bloom* (2022) 12 Cal.5th 1008, 1039 [collecting cases].) By contrast, "when a defendant, informed by counsel [of a strategy to admit criminal conduct], neither consents nor objects to the course counsel describes . . ., counsel is not automatically barred from pursuing that course." (*Florida v. Nixon* (2004) 543 U.S. 175, 178.)

34

error of the kind our decisions have called 'structural'; when present, such an error is not subject to harmless-error review." (*Id*. at p. 427.)

We independently review the legal question of whether a defendant's constitutional rights were violated. (*People v. Cromer* (2001) 24 Cal.4th 889, 894; *People v. Palmer* (2020) 49 Cal.App.5th 268, 280.) The constitutional right recognized in *McCoy* applies in limited circumstances; it is only implicated where defense counsel concedes guilt "over the defendant's intransigent and unambiguous objection." (See *McCoy, supra*, 584 U.S. at p. 426.) To obtain relief under *McCoy*, the record must show (1) that defendant's plain objective was to maintain his innocence and pursue an acquittal, and (2) that trial counsel disregarded that objective and overrode his client by admitting guilt. (*People v. Eddy* (2019) 33 Cal.App.5th 472, 482-483.)

C. *Analysis*

We find no *McCoy* error. The circumstances of this case are not analogous to those presented in *McCoy*. Unlike in *McCoy*, at no point did counsel override Maury's Sixth Amendment "autonomy right" to control the fundamental objective of his defense by conceding guilt over his objection. Instead, against Maury's expressed wishes, counsel presented mitigation evidence (Szerencsy's testimony) and argument at the penalty trial from which the jury could have (at most) inferred consciousness of guilt on the part of Maury. However, this was not tantamount to an admission of guilt for purposes of the constitutional right recognized in *McCoy*. By presenting a defense at the penalty trial, counsel did not deprive Maury of his right to determine that one of the fundamental objectives of his defense at the penalty phase was to maintain innocence. And the record reflects that, consistent with that objective, counsel asserted that Maury was factually innocent at both the guilt and penalty phases.

Further, while it is undisputed that Maury's objectives at the penalty phase were to maintain his innocence and protect his family (by not presenting mitigating evidence about his difficult upbringing), the record unequivocally reflects that Maury had a third

35

objective:  obtaining a death verdict.  At in camera hearings prior to the commencement of the penalty trial, Maury made it clear that he preferred the death penalty, that he had instructed his attorneys to "get that accomplished," and that he was willing to stipulate to a death verdict in exchange for the return of property seized by law enforcement.  Maury explained that while he understood his attorneys had a legal and/or moral obligation to "put on some type of case" in mitigation, he did not want them to do so.  Indeed, to achieve his preferred penalty, Maury promised to "sabotage" any efforts by his attorneys to "put on a good defense" by taking the stand at the penalty trial and "piss[ing] the jury off."  Later, at an in camera hearing during the penalty trial, Maury reiterated that he preferred the death penalty and indicated that he was prepared to personally address the jury against the advice of counsel to express his view as to the appropriate penalty.  As indicated, following the presentation of mitigating evidence, Maury took the witness stand and read a prepared statement, urging the jurors to return a death verdict if they believed he was guilty of committing the charged offenses.  Maury also told the jurors that he had a normal childhood, that his sister (Cummins) had "shaded the truth a little bit to help [him]," that he had never suffered from depression, and that his attorneys were required to present mitigating evidence.

Here, counsel did not do what *McCoy* prohibits--concede guilt over Maury's express objection.  Rather, at the guilt phase, counsel maintained that Maury was factually innocent and urged the jury to acquit him of all charges.  In doing so, counsel emphasized that the prosecution had not met its burden of establishing guilt beyond a reasonable doubt.  (See *Maury, supra*, 30 Cal.4th at p. 375 [explaining that "[t]he primary theory of the defense at trial was that the prosecution had not proven its case against defendant"].)  After the jury disagreed and found Maury guilty of the charged offenses, including three counts of first degree murder, counsel evidently concluded that the best strategy to avoid a death verdict at the penalty trial would be to present mitigating evidence and maintain that Maury was factually innocent.  This was a reasonable defense

36

strategy to achieve the best result possible for Maury under difficult circumstances. Although the strategy was contrary to Maury's stated objective of obtaining a death verdict, reversal of the death judgment is not warranted under *McCoy*. Absent an express concession of guilt by defense counsel or any other conduct or statement(s) tantamount to such a concession, *McCoy* is not implicated.

To the extent defense counsel should not have presented a defense at the penalty trial against Maury's wishes,[15] see *People v. Amezcua and Flores* (2019) 6 Cal.5th 886 at page 925 ("among the core of fundamental questions over which a represented defendant retains control is the decision whether or not to present a defense at the penalty phase of a capital trial"),[16] any error was harmless. In urging a contrary result, Maury insists that under *McCoy*, he need not demonstrate prejudice because counsel's error was structural and therefore requires automatic reversal. We are unpersuaded. As we next explain, we find Maury's reliance on *McCoy* for this argument misplaced.

---

[15] The record clearly demonstrates that Maury did not want his attorneys to call the witnesses who testified at the penalty trial. There is nothing in the record suggesting that Maury wanted to call any other witness. In other words, the record shows that Maury did not wish to present a defense at the penalty trial.

[16] The California Supreme Court recently held that a capital defendant is not deprived of his Sixth Amendment right to counsel by virtue of his counsel's acquiescence in the defendant's insistence that no defense be presented at the penalty phase. (*People v. Amezcua and Flores*, *supra*, 6 Cal.5th at pp. 925-926; see also *People v. Poore* (2022) 13 Cal.5th 266, 306 [" 'To require defense counsel to present mitigating evidence over the defendant's objection would be inconsistent with an attorney's paramount duty of loyalty to the client and would undermine the trust, essential for effective representation, existing between attorney and client' "].) In so holding, the *Amezcua and Flores* court explained that the outcome was dictated by 30 years of precedent, beginning with *People v. Bloom* (1989) 48 Cal.3d 1194. (*Amezcua and Flores*, at p. 925.) We note that our high court's decision in *Bloom* was issued in late June 1989, about two months before the penalty phase in this case commenced. The trial record contains no discussion of *Bloom*.

*McCoy* reversed the guilt and death judgments in a capital case without any inquiry into harmlessness.  (See *McCoy, supra*, 584 U.S. pp. 426-428.)  In finding that there was no need to show prejudice, the United States Supreme Court concluded that the Sixth Amendment autonomy right violated by counsel's admission of guilt at the guilt phase of a capital trial over his client's express objection was structural because it affected the framework within which the trial proceeded, as distinguished from a lapse or flaw that was " 'simply an error in the trial process itself.' " (*Id*. at p. 427.)  The court further concluded that the error was structural because it violated " 'the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty.' " (*Ibid*.)  In reaching these conclusions, the high court explained that such an error is not subject to harmless error review because it "blocks the defendant's [autonomy] right to make fundamental choices about his own defense" and "the effects of the admission would be immeasurable," since "a jury would almost certainly be swayed by a lawyer's concession of his client's guilt." (*Id*. at p. 428.)

We decline Maury's invitation to extend the structural error found in *McCoy* to the unique circumstances of this case.  As our Supreme Court recently explained:  " ' "[M]ost constitutional errors can be harmless." [Citation.]  "[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis." ' [Citation.]  We have therefore recognized that structural error is limited to circumstances in which the error 'necessarily affected the whole framework within which the trial proceeded' or 'defies analysis for prejudice.' " (*People v. Nieves* (2021) 11 Cal.5th 404, 461.)  Neither of these circumstances applies here.

As we have discussed, in contrast to *McCoy*, here Maury's Sixth Amendment autonomy right to insist that his counsel refrain from conceding guilt was not violated.  Rather, this case involved a disagreement over whether counsel should pursue Maury's preferred penalty at the penalty phase of a capital trial; specifically, whether counsel

38

should present mitigating evidence and argument overriding defendant's desire to obtain a death verdict. Further, unlike *McCoy*, Maury achieved the objective he desired, notwithstanding his counsel's best efforts to obtain a different result--a sentence of life without the possibility of parole. We are not aware of any case, and Maury cites none, establishing that the specific error asserted here belongs to the " ' "very limited class of errors" ' " recognized as structural error requiring reversal without regard to prejudice. (See *People v. Mendoza* (2016) 62 Cal.4th 856, 900 [identifying examples of structural error and referring to them as "belonging to a 'highly exceptional category' "].) And Maury offers no cogent legal analysis explaining why the structural error found in *McCoy* extends to the factually distinct circumstances of this case. Indeed, Maury has not persuasively articulated in his opening brief how the effects of the asserted error are "immeasurable," such that a new penalty trial is warranted without any need to show prejudice. Instead, for the first time in his reply brief, Maury simply claims (without elaboration) that the mitigating evidence had an "immeasurable impact" because it is "difficult to tell the effect" that the evidence had on the jury. But the asserted constitutional error is not of the kind that may be ranked as structural. It did not render the penalty trial fundamentally unfair. It does not defy analysis by harmless error standards. Thus, we reject Maury's contention that he must be accorded a new penalty trial without an examination of prejudice.

Because we find no structural error, and because Maury has failed to argue (let alone demonstrate) that he suffered prejudice as result of the asserted error, he is not entitled to habeas corpus relief. (See *People v. Stewart* (2004) 33 Cal.4th 425, 462-463.)

Even if Maury had properly raised a claim of prejudicial error, we would reject it. Our review of the record convinces us beyond a reasonable doubt that the jury's penalty phase verdict would have been the same absent the Sixth Amendment violation asserted by Maury. (See *People v. Schuller* (2023) 15 Cal.5th 237, 251 [the "beyond a reasonable doubt" standard for harmlessness set forth in *Chapman v. California* (1967) 386 U.S. 18,

applies to federal constitutional errors].)  This was not a close case.  The Secret Witness calls, the similarities of the victims, and Maury's incriminating conduct and statements made the case against him strong and compelling.  After a lengthy trial, the jury deliberated for a little more than one full day before reaching its guilt phase verdicts and special circumstance findings.  And the challenged mitigating evidence presented at the penalty trial--Szerencsy's testimony--was brief and did not amount to a concession of guilt.  When asked, Szerencsy merely indicated it was "possible" Maury was talking about himself when he said (in the summer of 1987) that his brother was "giving this girl the creeps because he would sit in the living room with the lights out and he would rock in a chair and he would talk about killing people."  In closing argument, defense counsel maintained (as they did during the guilt phase) that Maury was factually innocent of the charged murders.  As for the appropriate penalty, the defense cited several mitigating factors, including Szerencsy's testimony suggesting that Maury was "seeking help" by "talking to her about medication" a "sick brother" and murder.  The prosecution, for its part, questioned the value of Szerencsy's testimony, pointing out that Maury did in fact have a brother with mental health issues.

Although the record clearly demonstrates that the trial court allowed defense counsel to usurp control of an issue that the law now makes clear was within Maury's sole prerogative--namely, his Sixth Amendment autonomy right to decide that the fundamental objective of the defense at the penalty phase was to obtain a death verdict--we fail to see how Maury was prejudiced.  Maury makes no effort in his opening brief to explain how or why he would have obtained a more favorable outcome had counsel pursued his preferred penalty, which would have included presenting no defense at the penalty trial and asking the jury to return a death verdict.  In his reply brief, Maury argues that "but for the denial of his Sixth Amendment autonomy rights, [he] would not have felt compelled to sabotage his penalty phase."  But Maury did not "sabotage" his objective of obtaining a death verdict.  To the contrary, he read a statement to the jury in an effort to

40

achieve that objective. After the mitigating evidence was presented, Maury took the witness stand and made his position unmistakably clear as to what he believed the appropriate penalty was. Among other things, he told the jury: "Because of your verdict and findings I feel the only penalty that you can conscientiously . . . consider is the death penalty. You found me guilty of three murders, one rape, one attempted rape and one robbery. It's totally unrealistic for you to give me life in prison without parole. If you think I'm guilty, you give me the death penalty." Thus, Maury effectively did what defense counsel refused to do on his behalf, ask the jury for a death verdict. Under the circumstances presented, we see no basis for reversal.

II

*Remaining Contention*

Equally unavailing is Maury's related contention that, in denying his motions to represent himself at the penalty phase pursuant to *Faretta, supra,* 422 U.S. 806, the trial court improperly forced him to proceed with counsel burdened by an irreconcilable conflict of interest, which adversely affected counsel's performance, constructively deprived him of the assistance of counsel, and prejudiced his case.

We conclude the superior court properly found that this claim is procedurally barred as successive. Maury failed to show that it constitutes a "newly available" claim within the meaning of Proposition 66 (e.g., the claim is based on a recent change in the law), such that it was properly raised in his second (the instant) state habeas corpus petition. (See *Friend, supra*, 11 Cal.5th at p. 724.)[17] Nor did Maury make the requisite showing under Proposition 66 to seek a second chance to make an argument he could have made earlier. Maury did not demonstrate, by the preponderance of all available

---

[17] The record reflects Maury raised an ineffective assistance of counsel claim in his initial state habeas corpus petition that was predicated on a conflict of interest with his attorneys that "developed" during the penalty phase of trial.

41

evidence, that he was actually innocent of any crime of which he was convicted or ineligible for the death penalty. (*Friend,* at pp. 723-724, 727; § 1509, subd. (d).) And, as the superior court correctly found, Maury did not satisfy his burden to avoid the successiveness bar on grounds of ineffective assistance of prior appellate counsel. Maury's petition does not allege with specificity any facts supporting the conclusion that the inadequate presentation or omission of this issue from his initial state habeas corpus petition reflected incompetence of counsel. (*Friend,* at p. 731, fn. 5.)

In any event, even were we to assume that Maury's claim is not procedurally barred, we would reject it on the merits. In his opening brief, Maury makes little effort to show reversible error, citing a handful of cases without providing any meaningful legal analysis explaining how and why reversal is required. Consequently, no further discussion of this issue is necessary. " 'Mere suggestions of error without supporting argument or authority other than general abstract principles do not properly present grounds for appellate review.' " (*Multani v. Witkin & Neal* (2013) 215 Cal.App.4th 1428, 1457.) "We may and do 'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt.' " (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277.)

Forfeiture aside, we see no basis for reversal.[18] Contrary to Maury's contention, a new penalty trial is not required under *United States v. Cronic* (1984) 466 U.S. 648. (See

---

[18] As noted, the trial court denied Maury's *Faretta* motions as untimely. Although our Supreme Court has declined to identify a specific period in time at which a motion for self-representation is untimely, it has held on numerous occasions that such motions made on the eve of trial are untimely. (*People v. Wright* (2021) 12 Cal.5th 419, 436.) Here, Maury did not invoke his right to self-representation until the day the penalty trial commenced, and he renewed his request to represent himself in the middle of the trial, after two mitigation witnesses testified. Under these circumstances, the *Faretta* motions were directed to the sound discretion of the trial court. (*People v. Bloom, supra,* 48

*id.* at pp. 658-662 [describing three situations in which a defendant need not show prejudice to prevail on a claim of ineffective assistance of counsel].) In a conclusory fashion, Maury asserts reversal is required because he was "forced" to proceed with counsel "burdened by an irreconcilable conflict of interest," which effectively denied him his right to counsel at the penalty phase and constituted structural error. As our Supreme Court has explained: " 'Defendants have been relieved of the obligation to show prejudice [under *Cronic*] only where counsel was either totally absent or was prevented from assisting the defendant at a critical stage. . . . In other circumstances, the petitioner must show how specific errors undermined the reliability of the verdict.' " (*People v. Brown* (2014) 59 Cal.4th 86, 115.) Maury has failed to show that this is the rare case where *Cronic's* presumed prejudice rule applies. And a fair reading of the record does not support such a finding.

Maury has also failed to demonstrate that a new penalty trial is warranted because his counsel labored under a conflict of interest at the penalty phase that compromised their loyalty to him in violation of his Sixth Amendment right to the assistance of counsel. In his reply brief, Maury specifically argues for the first time that his attorneys were burdened by an *actual* conflict of interest that adversely affected their performance and prejudiced him.[19] As an initial matter, we deem this belated argument forfeited.

---

Cal.3d at p. 1220 [a motion for self-representation made for the first time after the guilt phase of a capital trial is addressed to the trial court's discretion].) On appeal, Maury provides no legal argument demonstrating the trial court erred in denying his motions as untimely. And we discern no abuse of discretion by the trial court. (*People v. Horton* (1995) 11 Cal.4th 1068, 1110 [self-representation motion made on the date scheduled for trial (shortly before the actual commencement of trial) untimely]; see also *Wright*, at pp. 432, 437-439 [*Faretta* motion made two days before the first day of trial was untimely]; *People v. Valdez* (2004) 32 Cal.4th 73, 102 [*Faretta* motion made "moments before jury selection was set to begin" deemed untimely].)

[19] Maury did not make this specific argument in his second state habeas petition, request for certificate of appealability, or opening brief.

(*Newton v. Clemons* (2003) 110 Cal.App.4th 1, 11 [a reviewing court will ordinarily not consider arguments made for the first time on appeal]; *Raceway Ford Cases* (2016) 2 Cal.5th 161, 178 ["We generally do not consider arguments raised for the first time in a reply brief"]; *In re Groundwater Cases* (2007) 154 Cal.App.4th 659, 693 ["Basic notions of fairness dictate that we decline to entertain arguments that a party has chosen to withhold until the filing of its reply brief, because this deprives the respondent of the opportunity to address them on appeal"].) But even if we were to consider the untimely argument, we would find that it lacks merit.

The constitutional right to the assistance of counsel includes the correlative right to representation free from any conflict of interest that undermines counsel's loyalty to his client. (*People v. Wilson* (2023) 14 Cal.5th 839, 861.) " ' "[A] defendant is deprived of his or her constitutional right to the assistance of counsel in certain circumstances when, despite the physical presence of a defense attorney at trial, that attorney labored under a conflict of interest that compromised his or her loyalty to the defendant." [Citation.] "As a general proposition, such conflicts 'embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or his own interests.' " ' " (*Ibid.*)

" 'Under the federal Constitution, prejudice is presumed when counsel suffers from an actual conflict of interest. [Citation.] This presumption arises, however, "only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' " [Citations.] An actual conflict of interest means "a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties." [Citation.] Under the federal precedents, which we have also applied to claims of conflict of interest under the California Constitution, a defendant is required to show that counsel performed deficiently and a reasonable probability exists that, but for counsel's deficiencies, the

result of the proceeding would have been different.' " (*People v. Wilson, supra*, 14 Cal.5th at pp. 861-862.)

Maury has not demonstrated that his attorneys actively represented conflicting interests during the penalty phase and that an actual conflict of interest adversely affected their performance. Nor has Maury shown deficient performance by counsel that resulted in *prejudice*. Simply put, Maury failed to establish that but for counsel's alleged deficiencies, the result of the penalty trial would have been different. Thus, Maury's conflict of interest claim fails. (*People v. Ng* (2022) 13 Cal.5th 448, 530 [to succeed on a conflict of interest claim a defendant "must establish an actual conflict, deficient performance, and prejudice"].)

## DISPOSITION

The trial court's order denying Maury's second state habeas corpus petition is affirmed.

/s/
Duarte, J.

We concur:

/s/
Hull, Acting P. J.

/s/
Boulware Eurie, J.